FENNEMORE CRAIG, P.C.
Gerald L. Shelley (No. 010453)
Nancy J. March (No. 012802)
2394 East Camelback, Suite 600
Phoenix, AZ 85016-3429
Telephone: (602) 916-5000
Email: gshelley@fclaw.com
Email: nmarch@fclaw.com

Attorneys for Reorganized Debtor
Florence Hospital at Anthem, LLC

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 Proceedings |
| FLORENCE HOSPITAL AT ANTHEM, LLC, | Case No. 4:13-bk-03201-BMW |
| Debtor. | **HEARING BRIEF FILED BY REORGANIZED DEBTOR FLORENCE HOSPITAL AT ANTHEM, LLC WITH RESPECT TO CLAIMS ASSERTED BY BLUE WOLF CAPITAL FUND III, L.P.** |
| | **Trial Date: September 27 and 28, 2017**<br>**Time: 10:00 a.m.**<br>**Location: U.S. Bankruptcy Court**<br>**38 S. Scott Ave.**<br>**Courtroom 446**<br>**Tucson, AZ 85701** |

Reorganized Debtor, Florence Hospital at Anthem, LLC ("Florence Hospital" or the "Debtor"), by and through its duly authorized, undersigned attorneys, submits this Hearing Brief in accordance with the Court's "Evidentiary Hearing Scheduling Order" entered in this matter on May 3, 2017, with respect to Florence Hospital's objection to the administrative claim asserted against it by Blue Wolf Capital Fund III, L.P. ("Blue Wolf").

## **INTRODUCTION**

Blue Wolf is a disappointed buyer of the Debtor's assets. After almost every major constituency in this case, including the Debtor's sole manager, asserted that its proposed $5 million opening bid was unacceptably low, Blue Wolf did not sweeten the pot. At the same time, the Debtor's senior lender, Bank SNB,[1] and affiliated debtor, Gilbert Hospital, LLC ("Gilbert Hospital"), teamed up to develop and propose a joint plan of reorganization for the Debtor and Gilbert Hospital that resolved a number of economic and legal impediments to the sale. The joint plan quickly gained traction with the major players in the case and became the option that was in the best interest of the estate.

After the Debtor withdrew the sale motion from the Court's consideration, Blue Wolf filed an administrative claim alleging tort theories against the Debtor in an amount that now exceeds $1.4 million. The asserted basis for the claim was that the Debtor supposedly misrepresented its "corporate authority" to proceed with the sale. Although the phrase "corporate authority" was raised by a number of parties as one of many issues that needed to be addressed with respect to the proposed bankruptcy sale, it was not the reason that the sale was scuttled. Rather, the inability of Blue Wolf and the Debtor to resolve the various legal and economic impediments to sale, and the relative attractiveness of the joint plan concept, were the causes of Blue Wolf's loss.

Therefore, this case is not primarily about whether the Debtor had authority to sign an Asset Purchase Agreement with Blue Wolf to commence an auction sale under 11 U.S.C. § 363. Instead, the main question in this case is whether Blue Wolf can recover from the Debtor for its decision to withdraw the motion for sale when: (1) Blue Wolf had not satisfied the conditions precedent to the sale, including negotiating an assumption of the Debtor's real property lease with MPT of Florence ("MPT"); (2) the Debtor's primary

---

[1]    Bank SNB was known as "Stillwater National Bank" when the bankruptcy case was commenced.

NMARCH/13238549.1/039450.0001

secured creditor, Bank SNB, objected to the sale and asserted the sale could not be approved over its objection under Section 363(f);[2] (3) a sale to Blue Wolf under the terms of the Asset Purchase Agreement (the "APA") would not have afforded a meaningful recovery to creditors; and (4) a superior alternative was proposed and developed by Bank SNB and Gilbert Hospital.

For the reasons set forth below, Blue Wolf's claim against the Debtor should be denied in full. First, Blue Wolf cannot prove a number of elements of its tort claim. Most notably, the damages supposedly incurred by Blue Wolf were not proximately caused by any lack of authority of the Debtor to act under the APA, but rather by the fact that the proposed initial bid under the APA was too low to resolve the numerous impediments to the sale raised by parties in interest and, therefore, the sale could not be approved either in accordance with 11 U.S.C. § 363(f), or as in the best interests of the bankruptcy estate. Further, Arizona's "economic loss rule" precludes Blue Wolf from recovering on tort claims for purely financial losses arising from a contractual relationship.

Even if the Court were to find that the Debtor made negligent misrepresentations that caused Blue Wolf's damages, and that the economic loss doctrine did not preclude recovery, Blue Wolf's damages must be limited in whole or in part by its contributory negligence in failing to question the Debtor's authority and in opting to go ahead with the sale in the face of the numerous challenges raised by the parties before and after the APA was signed. In addition, more than half of the damages asserted by Blue Wolf consist of its attorneys' fees in litigating its claim. Attorneys' fees are not available in tort.

Blue Wolf's claim sounds in contract rather than in tort. Blue Wolf admitted this when Charles Miller advised the Debtor in March, 2015 that it was in breach of the APA and demanded that the Debtor cure the breach by asking the Court to consider the sale

---

[2]    References to "Section" refer to the United States Bankruptcy Code, 11 U.S.C. § 1001, *et seq,* unless otherwise provided.

FENNEMORE CRAIG, P.C.

PHOENIX

NMARCH/13238549.1/039450.0001

1  motion. However, Blue Wolf's breach of contract claim based on the APA must also fail,
2  since no contractual liability can be based on an APA that was not approved by the
3  Bankruptcy Court, when the APA by its terms required Court approval to become
4  effective.

5  Finally, the amounts sought by Blue Wolf as damages are unreasonable, and were
6  of no benefit to the estate.  For example, Blue Wolf's lead counsel bills at a current rate of
7  $1,300 per hour, which is likely more than the double the hourly rate of any attorney
8  participating in this case.  The Debtor asserts that review of the contents of Blue Wolf's
9  bills is premature, particularly since the invoices were not provided to the Debtor until one
10  week before trial.  Therefore, the Debtor reserves the right to raise specific objections,
11  especially to the attorneys' fees component of the claim, if Blue Wolf's claims for
12  damages are successful.

13  **FACTUAL BACKGROUND**

14  Blue Wolf requests allowance and payment of an administrative claim against
15  Florence Hospital in the amount of $1,242,999.88, as of the end of December, 2016,
16  which it recently supplemented to include its 2017 expenses (the "Claim").  The Claim
17  constitutes Blue Wolf's alleged damages arising from Florence Hospital's decision not to
18  pursue the proposed auction sale of its assets, with Blue Wolf as the stalking-horse bidder.
19  Pursuant to the Claim, Blue Wolf asserts Florence Hospital fraudulently or negligently
20  misrepresented to Blue Wolf its authority to sell its assets and that the alleged
21  misrepresentation of authority caused its damages.  Florence Hospital asserts that the
22  Claim is without merit, no misrepresentation of authority occurred and no fraud was
23  committed, and Blue Wolf incurred expenses, not in reasonable reliance on any fraudulent
24  misrepresentation, but rather in the pursuit of a sale at a low price that could not, and did
25  not, gain the support of the major parties in the case.

26

FENNEMORE CRAIG, P.C.

PHOENIX

NMARCH/13238549.1/039450.0001

The Debtor in this case worked with its investment banker, CKS Securities, for over seven (7) months, from at least June, 2014, when Terner Capital Group, LLC submitted a Letter of Intent to purchase the Debtor's assets (the "Terner LOI"), to February, 2015, when the proposed sale to Blue Wolf was withdrawn, to consummate a Chapter 11 exit strategy involving a sale of its assets. From the time the Debtor filed its "*Motion for Orders: (1) Approving a Sale of Debtor's Assets Free and Clear of Liens, Claims and Interests, (2) Approving Assumption and Assignment of Unexpired Leases and Executory Contracts, (3) Approving Certain Bid and Auction Procedures, (4) Setting Date and Time for Hearing on Proposed Sale, and (5) Approving Form and Notice of Auction and Sale Hearing*" on June 11, 2014 at TE 6;[3] Dkt No. 543, the Debtor's efforts faced numerous legal and practical obstacles and substantial resistance from the primary secured and unsecured creditors in the case, the Debtor's landlord on the hospital facility, and others. *See, e.g.,* TE 225, 226, 227, 228, and 229; Dkt Nos. 549, 550, 551, 552, and 553. These objections related to the amount of Bank SNB's secured claim, an assumption of MPT's lease, and a proposed break-up fee, among other issues.

After the Terner LOI was withdrawn, Blue Wolf was identified as the stalking-horse bidder for Florence Hospital's assets in September, 2014 with an initial bid of $5 million pursuant to the Blue Wolf Letter of Intent (the "Blue Wolf LOI"). At that time Blue Wolf was well aware, or should have been aware, of the objections and concerns of the Debtor's major stakeholders with respect to the Terner LOI, as filed with the Court. The same or similar objections were also raised to the Blue Wolf LOI. *See* TE 230, 231 and 233; Dkt Nos. 600, 601, and 603. On October 17, 2014, the Court entered a Bid Procedures Order at Dkt No. 613 (TE 9), approving Blue Wolf as the stalking-horse bidder, requiring the filing of an executed Asset Purchase Agreement by December 5,

---

[3] "TE", as used in this Hearing Brief, refers to "Trial Exhibit" as set forth in the Joint Pre-trial Statement filed by the parties at Dkt No. 1571.

1  2014, requiring interested bidders to be certified by December 10, 2014, and setting

2  December 15, 2014 as the deadline to object to the proposed auction sale of Debtor's

3  assets.

4      Throughout Blue Wolf's due diligence period and thereafter, numerous hearings

5  were held in the Bankruptcy Court to consider the parties' concerns with the proposed

6  sale. *See, e.g.,* Transcripts of Hearings on Oct. 2, 2014 and Oct. 6, 2014, at TE 245 and

7  246.  On October 8, 2014, Bank SNB and Gilbert Hospital filed a "*Notice of Commitment*

8  *to File Creditor's Plan*" at Dkt No. 607.  On November 17, 2014, Bank SNB and Gilbert

9  Hospital filed a "*Joint Plan of Reorganization for Gilbert Hospital, LLC and Bank SNB*

10 *Dated November 17, 2014*" at Dkt No. 629 (the "Joint Plan") (TE 234), providing for the

11 reorganization of both Florence Hospital and Gilbert Hospital under common

12 management and control.

13     By December 3, 2014, Blue Wolf had completed its due diligence and decided it

14 would proceed as stalking-horse bidder for Debtor's assets.  The Debtor filed its "*Notice*

15 *of: (1) Blue Wolf Capital Fund III, L.P.'s Intent to Proceed with Acquisition of Hospital;*

16 *(2) Filing Executed Asset Purchase Agreement Between the Debtor, as Seller, and Blue*

17 *Wolf Capital Fund III, L.P., as Buyer; and (3) Improvement of Consideration to be*

18 *Provided to the Debtor's Estate as Set Forth in the Asset Purchase Agreement*" at Dkt No.

19 645 (TE 21).  The Blue Wolf Asset Purchase Agreement (the "Blue Wolf APA") was

20 signed by Art Doloresco, CEO, on behalf of the Debtor.

21     Article 9 of the Blue Wolf APA set forth the "Conditions Precedent to Obligations

22 of Buyer to Close."  These conditions included the following:

23          9.5    Sale Order.  The Bankruptcy Court shall have
            entered the Sale Order on or before January 15, 2015, or such
24          later date as Buyer may approve, in form and substance
            acceptable to Buyer and its counsel in their sole discretion . . .
25
26          . . .

1             9.9   <u>Real Property Lease</u>.  Buyer and MPT shall
2      have negotiated an amendment or modification to the Real
       Property Lease and a subordination and attornment agreement
3      with the mortgagee of the property (if there is a mortgagee),
       each on terms and subject to conditions satisfactory to Buyer
4      in its sole discretion.

5             9.10   <u>Employment Agreements</u>.  Buyer and Art
       Doloresco shall have negotiated an employment agreement
6      between Buyer and Art Doloresco on terms acceptable to
       those parties.

7             9.11   <u>IT Hosting Services Agreement</u>.  To the extent
       that the IT transfer from Gilbert Hospital to Seller is not
8      completed by the Closing to the satisfaction of both Seller
       and Buyer, there shall be an IT Hosting Services Agreement
9      with Gilbert Hospital on terms and subject to conditions
       satisfactory to Buyer in its sole discretion that Seller can
10     assume and assign to Buyer as an Assigned Contract.

11   Blue Wolf APA, Trial Exhibit 11, at pp. 12-13.  These conditions precedent to closing

12   were not satisfied before February 9, 2015, when the Debtor withdrew the proposed sale.

13   *See* TE 46; Dkt. 760.  Although the Debtor subsequently filed a Notice at Dkt No. 764

14   (TE 47) that Blue Wolf and MPT had entered into a term sheet with respect to the lease,

15   the terms were not binding and other terms remained unresolved.  (TE 49; Dkt No. 764-1)

16   Moreover, the efforts of the Debtor to obtain a transfer of IT from Gilbert were

17   unsuccessful, in part because the Court declined to allow Bank SNB's cash collateral to be

18   used for this purpose over its objection.  *See* TE 92; Dkt No. 667.

19       By the December 10, 2014 deadline, Blue Wolf and Bank SNB (with a credit bid)

20   emerged as the only bidders for the assets of the Debtor.  TE 32; Dkt No. 668.   Against

21   this backdrop, Dr. Johns, sole Manager of the Debtor, filed a Statement of Position

22   opposing the sale on the proposed terms to Blue Wolf, because it offered an insignificant

23   return to unsecured creditors and because it favored professionals of the Debtor.  *See* TE

24   10; Dkt No. 665.

25

26

FENNEMORE CRAIG, P.C.

PHOENIX

NMARCH/13238549.1/039450.0001

1　　　　　In the meantime, after months of negotiations with the main stakeholders in the

2　case about the various issues that concerned them, the Debtor and Blue Wolf remained

3　unable to resolve the concerns of the major stakeholders.　Four (4) parties in interest –

4　Bank SNB, MPT, the United States Trustee and Gilbert Hospital all filed objections to the

5　proposed auction sale (*see* TE 33, 34, 35, and 37; Dkt Nos. 673 – 676) (collectively, the

6　"Sale Objections").　In the Sale Objections, the parties raised, among other objections:

7　(1) the sale could not proceed free and clear of Bank SNB's and MPT's liens and interests

8　over their objection; (2) none of the exceptions set forth in 11 U.S.C. § 363(f) was

9　satisfied, particularly in light of the decision of the Bankruptcy Appellate Panel in *Clear*

10　*Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 39 (9th Cir. B.A.P.

11　2008); (3) the Debtor lacked corporate authority to sell its assets; (4) the proposed sale

12　would not benefit the estate; (5) the requirements for assuming and assigning MPT's lease

13　to Blue Wolf had not been met; and (6) the Joint Plan would provide a better outcome for

14　creditors and parties in interest than the proposed sale would.[4]

15　　　　　The parties continued to assert their positions on these and other issues described

16　as "gating" issues during December, 2014 and January, 2015. *See, e.g.,* Dkt Nos. 688 (TE

17　180), 697 (TE 94), 700 (TE 95), 703 (TE 25), 709 (TE 181), 710 (TE 238), 712 (TE 96),

18　713 (TE 97), 714 (TE 38), 716 (TE 40), 718 (TE 239), 749 (TE 43), and the Court

19　conducted hearings on January 7, 2015, January 9, 2015, and January 27, 2016. *See*

20　Transcript of January 7, 2015 Hearing at TE 247 (Dkt No. 1560) and Transcript of

21　January 27, 2017 Hearing at TE 248 (Dkt No. 1561).　These negotiations proved

22　unfruitful.

---

[4]　　　The co-proponents of the Joint Plan were able to offer superior treatment because, under
the Joint Plan, intercompany claims between Gilbert Hospital and Florence Hospital would be
eliminated; Gilbert Hospital agreed to fund certain reserves for payment of claims; and Bank
SNB agreed to certain payment concessions in exchange for other protections offered under the
Joint Plan.

1    The proposed auction sale was eventually taken off the Court's docket on February

2    9, 2015, after Blue Wolf's efforts to satisfy the conditions precedent set forth in the APA

3    were unsuccessful. TE 46; Dkt No. 760. The Debtor had still not been able to resolve the

4    numerous "gating" issues raised in the Sale Objections, and in the meantime, the Joint

5    Plan was moving ahead toward confirmation. The Joint Plan proposed by Gilbert

6    Hospital and Bank SNB was a far superior financial option for all constituencies in the

7    case, supplanted the proposed sale as the solution that was in the best interests of the

8    estate, and ultimately proposed payment in full of all general unsecured creditors.

9        From the beginning of its involvement in this case and more so as time progressed,

10   Blue Wolf should have realized that a purchase price of $5 million would not enable the

11   Debtor to exit bankruptcy unless many other pieces fell into place, including:

12        ●    Administrative expenses could not increase much beyond the $1.3 million

13   that had been incurred by year end 2014.

14        ●    The primary secured creditor, Bank SNB, would have to accept, or be made

15   to accept, a significant haircut from its full secured claim of approximately $11.8 million.

16        ●    Bank SNB would have to agree not to credit bid or make an election under

17   Section 1111(b) of the Bankruptcy Code, or the Court would have to find that the sale

18   satisfied the requirements of Section 363(f).

19        ●    The sale would otherwise have to satisfy the requirements of the *Clear*

20   *Channel* case, or the Court would have to decide that it need not follow *Clear Channel*.[5]

---

[5]    In that case, the Bankruptcy Appellate Panel ruled that the "aggregate value of all liens" described in Section 363(f)(3) means the face value of those liens. As a result, in order for a sale of property to be permitted over the objection of a secured creditor, under Section 363(f)(3), the sales price must exceed the face amount of the liens asserted against the property. Although the Debtor argued that the Bankruptcy Court was not bound by a decision of the Bankruptcy Appellate Panel from another District, there is ample authority that it is bound. *See, e.g.*, *In re Proudfoot*, 144 B.R. 876, 879 (9th Cir. B.A.P. 1992) ("It is the position of this panel that BAP decisions originating in any district in the Ninth Circuit are binding precedent on all bankruptcy courts within the Ninth Circuit in the absence of contrary authority from the district court in that district."

FENNEMORE CRAIG, P.C.

PHOENIX

NMARCH/13238549.1/039450.0001

8

● The Debtor would have to recover $2 million in preferential transfers from affiliated entity, Gilbert Hospital.[6]

● Blue Wolf would have to satisfy the conditions precedent in the APA, which included modifying the lease of the hospital with MPT and entering into an IT hosting agreement with Gilbert Hospital, or separating the IT systems of the two hospitals. TE 11; Dkt No. 645-2, at pp. 12-13.

None of these obstacles was adequately addressed between September, 2014, when the Initial Letter of Intent (the "Initial LOI") with Blue Wolf was filed with the Bankruptcy Court, and February 9, 2015, when the Debtor withdrew its sale motion. In light of all of these unresolved impediments to sale, the advancement of a better alternative in the form of the Joint Plan, and the failure to renegotiate the MPT lease, the sale could not proceed. Consequently, the cause of Blue Wolf's damages was not a lack of authority to proceed, but instead the legal and practical impossibility of obtaining approval of the sale at the proposed price of $5.0 million in the face of the opposition asserted by Bank SNB, Gilbert Hospital and MPT, and the superior alternative offered by the Joint Plan.

## LEGAL ARGUMENT

**I.    BLUE WOLF CANNOT RECOVER AGAINST THE DEBTOR UNDER A TORT THEORY.**

### A.    The "Economic Loss Rule" Bars Blue Wolf's Recovery on a Tort Claim.

Arizona's economic loss rule generally provides that a contracting party who suffers only monetary loss cannot recover tort damages from the other party, but is instead

---

[6]     *See, e.g.*, Debtor's "*Omnibus Reply in Support of Debtor's Motion for Orders:  (1) Approving Sale of Debtor's Assets Free and Clear of Liens, Claims and Interests, and (2) Approving Assumption and Assignment of Unexpired Leases and Executory Contracts*" (the "Omnibus Reply"), at pp. 21-22 (TE 25, Dkt No. 703); "Potential Sources and Uses of Sale Proceeds and Excluded Assets" in email chain from Philip R. Rudd to Lenard M. Parkins, Andrew Schwartz, Art Doloresco and others in TE 250.

FENNEMORE CRAIG, P.C.

PHOENIX

NMARCH/13238549.1/039450.0001

limited to contract remedies. *See Apollo Group, Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th

Cir. 1995) (applying Arizona's economic loss rule to bar recovery by buyer of computer

system on negligent misrepresentation theory). The policy behind this rule was expressed

by the Arizona Supreme Court in *Salt River Project Agr. Imp. And Power Dist. v.*

*Westinghouse Electric Corp.*, 143 Ariz. 368, 376, 694 P.2d 198, 206 (1984), as follows:

> A basic policy of contract law . . . is to preserve freedom of contract and thus promote the free flow of commerce. This policy is best served when the commercial law permits parties to limit the redress of a purchaser who fails to receive the quality of product he expected. . . .
>
> Division One of the Arizona Court of Appeals has aptly summarized the difference between tort and contract:
>
> [T]he rationale for making a distinction is that traditional contract remedies are designed to redress loss of the benefit of the bargain while tort remedies are designed to protect the public from dangerous products.

*Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc.*, 136 Ariz. 444, 447, 666 P.2d 544, 547 (App. 1983) (internal citations omitted).

While contract remedies are designed to redress loss of the benefit of the bargain, tort

remedies are generally designed to protect the public from dangerous or defective

products. *Id.* Economic losses are best handled by contract law. *Arrow Leasing*, 136

Ariz. at 449, 666 P.2d at 549.

The Ninth Circuit Court of Appeals applied the *Salt River Project* ruling to hold

that negligent misrepresentation and other tort claims were barred by Arizona's economic

loss rule in a commercial case involving only economic damages. *Apollo Group, Inc. v.*

*Avnet, Inc.*, 58 F.3d 477 (9th Cir. 1995). In that case, the purchaser of a computer sued the

seller for negligence, negligent misrepresentation, breach of warranty and breach of

contract after the computer system did not work satisfactorily with a particular accounting

software package the plaintiff used. The lower court granted summary judgment in favor

of the seller on the tort-based claims, stating that those claims were barred by Arizona's economic loss rule. On appeal, the Ninth Circuit rejected the argument that negligent misrepresentation claims fell outside the economic loss rule, noting the plaintiff "complains that it has failed to receive the anticipated benefit of its bargain. Such benefit of the bargain claims are based in contract law and should be governed thereby." *Id.* at 480-81.

Arizona law further holds that most fraud claims arising out of a contract are barred by the economic loss doctrine. The Arizona District Court, in *Southwest Pet Prods.*, 89 F. Supp. 2d 1115, 1126 (D. Ariz. 2000), barred plaintiff's fraud claim pursuant to the economic loss rule, stating "[w]here the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label of 'fraudulent inducement' to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine." *See also Cook v. Orkin Exterminating Co., Inc.*, 227 Ariz. 331, 335 ¶ 20 n.6, 258 P.3d 149, 153 n.6 (Ct. App. 2011) (rejecting plaintiffs' argument that the economic loss rule did not apply to their claims for fraud and misrepresentation because "a contracting party is *limited wholly* to its contractual remedies for purely economic loss related to the subject of the parties' contract"). Moreover, the economic loss rule applies in Arizona even when there is no viable contract claim under the facts of the case. *See Apollo Group v. Avnet, Inc.*, 58 F.3d 477, 478-82; *see also* Ballinger, Jr., E and Thumma, S, *The History, Evolution and Implications of Arizona's Economic Loss Rule,* 34 Ariz. St. L.J. 491 (Summer, 2002).

In the present case, Blue Wolf seeks tort damages under theories of fraudulent and negligent misrepresentation of the Debtor's authority to enter into the APA. The substance of Blue Wolf's claims, and its damages, are the fact that it incurred costs to perform due diligence on its proposed purchase (and even more to prosecute its claim), and did not receive the benefit of its bargain under the APA because the Debtor withdrew

FENNEMORE CRAIG, P.C.

PHOENIX

NMARCH/13238549.1/039450.0001

the APA from Court consideration. Blue Wolf admits that it believed these facts gave rise to a breach of contract claim. *See* TE 22, Letter dated March 19, 2015 from Charles P. Miller to Art Doloresco and Philip Rudd, noting events of default under the APA, and requesting cure. Because Blue Wolf's damages arise out of the APA, and are therefore contract-based, Blue Wolf should not be permitted to recover under theories of tort.

**B.**     **Blue Wolf Cannot Prove the Elements of Fraud Under Arizona Law.**

Blue Wolf asserts that it is entitled to recover from the Debtor on theories of fraudulent or negligent misrepresentation of its authority to sign the Blue Wolf APA. Under Arizona common law, a plaintiff must prove each of the following nine (9) elements of fraud:

> (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Staheli v. Kauffman,* 122 Ariz. 380, 383, 595 P.2d 172 (1979). Blue Wolf's fraud claims against the Debtor fail at least under elements (2), (3), (4), (7), (8) and (9).

1.     The Debtor did not make false representations.

The Debtor employed CKS Securities, with the knowledge and approval of its sole Member, Dr. Johns, to pursue a sale of the Debtor's assets. Debtor's counsel, Philip Rudd, and its Chief Executive Officer, Art Doloresco, acted, together with CKS, with authority from the Debtor to find a buyer for the Debtor's assets, to propose the best deal possible, and to obtain Bankruptcy Court approval of that deal. Dr. Johns attended one or more meetings with Blue Wolf and/or CKS, received communications about the status of the Debtor's sale efforts, and timely received all pleadings that were filed in the case. . He also participated by telephone in one or more Bankruptcy Court hearings on the

1    proposed sale to Blue Wolf, including a hearing held on October 6, 2014. See Minute

2    Entry at Dkt No. 609. At no time after the Blue Wolf LOI was filed with the Court in

3    September, 2014, until December 12, 2014, when Dr. Johns filed his Statement of

4    Position with respect to the proposed sale, did Dr. Johns communicate any disagreement

5    to the proposed sale transaction to Mr. Rudd or Mr. Doloresco.

6            Accordingly, on December 3, 2014, when the Blue Wolf APA was submitted to the

7    Bankruptcy Court, and at all relevant times before December 12, 2014, Mr. Rudd and Mr.

8    Doloresco believed, in good faith, that they were acting within the scope of their authority

9    with respect to the Debtor and a proposed sale of its assets. Dr. Johns delegated authority

10   to Mr. Doloresco to manage Florence Hospital and, until December 12, 2014 apparently,

11   if not actually, delegated authority to perform the duties of debtor in possession in the

12   bankruptcy case as well. As set forth in the Debtor's Omnibus Reply (TE 25, Dkt No.

13   703), Mr. Doloresco had actual authority, implied authority, or apparent authority to sign

14   the APA to commence the sale process, sufficient to "bind" the Debtor to the APA.[7]

15           The Debtor did not misstate its authority to present the Blue Wolf sale to the Court

16   for approval or to sign the Blue Wolf APA. Accordingly, there was no false

17   representation that was material, and no knowledge by the Debtor that it falsely

18   represented its authority to sign the Blue Wolf APA and present the sale to the

19   Bankruptcy Court.

20           2.    <u>Blue Wolf did not reasonably rely on the Debtor's authority to sign
21                 the APA</u>.

22           Blue Wolf had participated in a number of bankruptcy auction sales before it

23   _____

24   [7]    Section 7.7.3 of the APA provides: "The sale of the Assets is, therefore, subject to the
     outcome of the Auction." Section 8.4 of the APA provides that the Seller had no obligation to
25   close a sale of Debtor's assets unless "[t]he Bankruptcy Court shall have entered the Sale Order."
     Accordingly, the Blue Wolf APA was not a binding contract in any event, and would not become
26   such unless and until the Bankruptcy Court approved the sale. TE 11, Dkt No. 645-2, at 10, 12.

attempted to acquire Blue Wolf, it is a sophisticated participant in such transactions, and it is represented by highly skilled and expensive counsel. It knew how to conduct due diligence[8] with regard to authority issues if it believed it was necessary to do so, it knew that the APA was not effective until the Bankruptcy Court approved it, and it knew it could be outbid at a bankruptcy auction if a better deal was proposed. Moreover, the sale process was certainly not rushed. Blue Wolf had been meeting with the Debtor's representatives for months prior to December, 2014, and had every opportunity to vet the corporate authority issue, including issues it now claims arise out of the Debtor's operating agreement and the amendment to that operating agreement, and whether those documents were effective. To claim that it was defrauded by these issues is disingenuous.

Finally, during the protracted time between the initial submission of the bid procedures order and the withdrawal of the sale motion, the major parties in the case filed numerous pleadings to present their objections to the process and to the sale, beginning before Blue Wolf was named as stalking-horse bidder, and the Court conducted many hearings at which those objections were discussed in detail. Therefore, there was no "surprise" surrounding the difficulties inherent in the sale of the Debtor's assets and in its ultimate collapse.

3.   <u>Blue Wolf Did Not Suffer "Consequent and Proximate Injury" as a Result of the "Authority Issue."</u>

Blue Wolf's "damages" were not caused by the Debtor's representations. To recover for fraud, "the plaintiff must plead and prove the 'detriment proximately caused' by the defendant's tortious conduct. . . . Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the

---

[8]   Notably, Blue Wolf's claim consists largely of attorneys' fees (which are not allowable for a tort claim) and due diligence costs. To the extent Blue Wolf's defective due diligence did not uncover the very documents and facts that Blue Wolf now claims defrauded them, they should not be able to recover those damages from the Debtor.

FENNEMORE CRAIG, P.C.

PHOENIX

NMARCH/13238549.1/039450.0001

representations must be shown." <u>In re Washington Trust Deed Service Corp.</u>, 224 B.R. 109, 113 (9ᵗʰ Cir. B.A.P. 1998) (party to a settlement could not collect from trustee who supposedly "fraudulently misrepresented" his intentions to settle, but later withdrew the settlement, because it was the lack of court approval of the settlement, rather than the absence of the trustee's support, that caused the damages).

Similarly, in the present case, it was not any false statements about lack of authority that caused Blue Wolf's damages. Instead, Blue Wolf's "damages" were caused by the poor economics of the transaction and Blue Wolf's inability to persuade MPT and Bank SNB to withdraw their objections to the sale, either through negotiation or by committing more capital to the transaction. Blue Wolf was a sophisticated player in Bankruptcy Court and was well aware of the risk that it would not be the successful bidder in an auction, and it further knew that the APA was not binding on the Debtor until it was approved by the Bankruptcy Court. Finally, when Bank SNB filed its "Notice of Commitment to File Creditor's Plan" at Dkt No. 607, Blue Wolf knew that it faced serious competition from Bank SNB and Gilbert Hospital for the Debtor's assets, yet it never offered to increase its bid.

Had the purchase price been adequate, Dr. Johns would not have voiced any opposition to the sale. The approval of the sale to Blue Wolf would then have depended upon satisfying the conditions set forth in the APA, and in either obtaining Bank SNB's approval for the sale or meeting the requirements of Section 363(f), as applied in the Ninth Circuit by the *Clear Channel* case.

**C.  Blue Wolf's Claims Also Do Not Qualify As Negligent Misrepresentation.**

"Negligent misrepresentation" is described by Restatement (Second) of Torts § 552(1)[9] as follows

---

[9]     "In the absence of contrary Arizona authority, [Arizona courts] follow the Restatement of

FENNEMORE CRAIG, P.C.

PHOENIX

NMARCH/13238549.1/039450.0001

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

This tort is recognized by Arizona courts. *See, e.g., McAlister v. Citibank (Arizona)*, 171 Ariz. 207, 215, 829 P.2d 1253, 1261 (1992); *St. Joseph's Hospital and Med. Ctr. V. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987).

1. <u>The Debtor did not provide false information.</u>

For the reasons set forth in Section A.1 above, Blue Wolf has no claim for negligent misrepresentation. There were no false statements made by the Debtor with regard to its authority to sign the Blue Wolf APA, whether intentional or negligent.

2. <u>There was no justifiable reliance.</u>

For the reasons set forth in Section A.2 above, Blue Wolf did not justifiably rely on the Debtor's authority to sign the Blue Wolf APA and bring it to the Bankruptcy Court for approval.

3. <u>Blue Wolf's damages did not arise from a negligent misrepresentation.</u>

For the reasons set forth in Section A.3 above, Blue Wolf did not incur damages as a result of any misrepresentation of the Debtor's authority to sign the non-binding Blue Wolf APA to commence an auction process with Blue Wolf as the stalking-horse bidder.

4. <u>Blue Wolf was contributorily negligent.</u>

Even if the facts justify a claim for negligent misrepresentation, which they do not, any damages suffered by Blue Wolf must be reduced by Blue Wolf's own fault in relying upon the misrepresentation. Restatement (Second) of Torts § 552A states that "[t]he Law." *Lerner v. DMB Realty, LLC*, 234 Ariz. 397, 404 ¶ 25 n.7, 322 P.3d 909, 916 n.7 (Ct. App. 2014).

recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying." A comment to that section explains:

> [W]hen the misrepresentation is not fraudulent but only negligent, the action is founded solely upon negligence, and the ordinary rules as to negligence liability apply. Therefore the contributory negligence of the plaintiff in relying upon the misrepresentation will bar his recovery. This means that the plaintiff is held to the standard of care, knowledge, intelligence and judgment of a reasonable man, even though he does not possess the qualities necessary to enable him to conform to that standard.

*Id.* cmt. a.

In this case, Blue Wolf was an experienced and sophisticated bidder on assets, both in the bankruptcy context and outside.

### D. Attorneys' Fees Cannot be Awarded on Tort Claims.

More than half of the amount of damages asserted by Blue Wolf against the Debtor on its tort claims consists of attorneys' fees billed by Greenberg Traurig and local counsel for prosecuting Blue Wolf's tort claims against the Debtor. *See* TE 64, 221 and 222. It is well established, however, that attorneys' fees may be awarded to the prevailing party under a contract claim pursuant to Ariz. Rev. Stat. § 12-341.01(A) or under a statute. Where, as here, the Debtor asserts common-law tort claims, the "American Rule" precludes an award of attorneys' fees. Thus, this portion of Blue Wolf's claim must be disallowed.

## II. BLUE WOLF DOES NOT HAVE CLAIMS FOR BREACH OF CONTRACT.

Blue Wolf cannot bring a breach of contract claim based upon the "authority" issue. A contract that requires third-party approval to be effective cannot serve as a basis for a breach of contract claim if such approval has not been granted. In *Washington Trust*

NMARCH/13238549.1/039450.0001

*Deed Service Corp.*, 224 B.R. 109 (9th Cir. B.A.P. 1998), the Bankruptcy Appellate Panel applied California law to circumstances similar to those in the case at bar. In that case, a Chapter 7 trustee entered into an agreement to settle a fraudulent conveyance lawsuit with a party who had received property from the debtor. The agreement provided that it was contingent on Bankruptcy Court approval. *Id.* at 111. After both parties had signed the settlement agreement, but before the Bankruptcy Court approved it, the trustee became aware of additional information that caused him to conclude that the settlement was no longer in the best interests of the estate and removed his motion to approve the settlement from the calendar. The Bankruptcy Court denied a motion to compel the trustee to pursue the settlement, which the court denied, after which he filed a state court lawsuit alleging the trustee had fraudulently misrepresented his intention to obtain approval of the settlement agreement. The state court suit was removed to Bankruptcy Court. The Court dismissed the misrepresentation lawsuit, finding the plaintiff's damages were not caused by the trustee's change of heart with respect to the settlement, but rather by the lack of court approval.

When "two parties execute a contract with the understanding that the approval of a third party is necessary for the agreement to take effect, the contract is not complete until the third party has approved. Until that happens neither party is bound by the agreement." 224 B.R. 109 at 114 (quoting *Santa Clara-San Benito Chapter of Nat'l Elec. Contractors' Ass'n v. Local Union No. 332*, 40 Cal.App.3d 431, 436, 114 Cal.Rptr. 909, 912 (1974)).

Arizona courts have applied similar principles. In *Johnson International, Inc. v. City of Phoenix*, 192 Ariz. 466, 471 ¶3, 967 P.2d 607, 612 (App. 1998), the Arizona Court of Appeals held that purported agreements between the City of Phoenix and a developer did not constitute contracts because there was no intent to be bound where the City made clear in the documents that the agreements would need to be approved by the Bureau of

FENNEMORE CRAIG, P.C.

PHOENIX

1   Reclamation to become effective.  *See id.* ("Thus, we find that the RFP, the MOU and the

2   Use Agreements contained explicit language of the City's intent not to be bound absent

3   BOR approval and no contract existed.").

4           Section 7.7.3 of the APA provides:  "The sale of the Assets is, therefore, subject to

5   the outcome of the Auction."  Similarly, pursuant to Section 8.4 of the APA, the Seller

6   had no obligation to close a sale of Debtor's assets unless "[t]he Bankruptcy Court shall

7   have entered the Sale Order."  Here, as in *Washington Trust Deed*, the Debtor did not

8   intend to be bound by the APA unless the Bankruptcy Court approved the sale to Blue

9   Wolf as the highest and best bidder.  The Debtor did intend, and authorized Art

10  Doloresco, to shop the Debtor's assets, to commence an auction sale with Blue Wolf as

11  the stalking-horse bidder with an initial bid of $5,000,000, and to work with CKS

12  Securities to generate robust interest in bidding on the Debtor's assets.

13          Moreover, Blue Wolf agreed to a specific contractual limitation of its damages

14  (which is perhaps why its Claim was brought in tort) in response to objections filed by the

15  U.S. Trustee and others to the initial Blue Wolf LOI.  On September 25, 2014, the Debtor

16  filed with the Bankruptcy Court a Letter of Intent executed by Blue Wolf and the Debtor

17  for the purchase of substantially all of the Debtor's operating assets for $5,000,000.  TE 8,

18  Dkt No. 594.  The initial Blue Wolf LOI provided for a $300,000 "cost reimbursement" to

19  Blue Wolf, payable in the event Blue Wolf was not the successful bidder, or if no auction

20  or sale of the Debtor's assets occurred.  *Id.*  After objections were asserted to the proposed

21  cost reimbursement, Blue Wolf and the Debtor negotiated a revised Letter of Intent, which

22  was filed with the Court on October 10, 2014.  TE 7, Dkt No. 608.  The amended Blue

23  Wolf LOI provided for a cost reimbursement of $175,000, payable <u>only</u> if Blue Wolf

24  entered into an APA and was not the successful buyer due to an overbid.   Blue Wolf

25  specifically agreed to limit its damages to $175,000, payable only in the event it was

26  outbid.

1   Finally, as numerous parties in interest raised and continued to press objections to

2   the sale, it became apparent that considerably more than $5.0 million would be necessary

3   to pay administrative claims, overcome any issues under *Clear Channel* or otherwise, and

4   to gain the acceptance of MPT and Gilbert Hospital.  Blue Wolf did not offer sufficient

5   capital to overcome those obstacles and, in the meantime, Blue Wolf was in effect

6   significantly outbid by the joint plan proposed by Gilbert Hospital and Bank SNB.  As a

7   result, it became clear that the Joint Plan was the "highest and best" offer for Blue Wolf's

8   assets.   As Judge Nielsen stated in the *America West Airlines* case, "There is a

9   fundamental difference between contracting to purchase a business in bankruptcy and

10  contracting to purchase a business not in bankruptcy."  *In re America West Airlines*, 166

11  B.R. 908, 911 (Bankr. D. Ariz. 1994).  Blue Wolf failed to take these differences into

12  consideration.

13          As set forth by the Ninth Circuit Court of Appeals in *In re Perez*, 30 F.3d 1209 (9th

14  Cir. 1994), Debtor's counsel "ha[d] an independent responsibility to determine whether a

15  proposed course of action is likely to benefit the estate."  *Id.* at 1219.  Counsel for the

16  Debtor may not "pursue a course of action, unless he has determined in good faith and as

17  an exercise of his professional judgment that the course complies with the Bankruptcy

18  Code and serves the best interests of the estate."  Under these circumstances, it was not

19  only appropriate for the Debtor to withdraw the proposed sale, but it was also necessary.

20  **III.   <u>CONCLUSION</u>.**

21          To approve a sale of assets under 11 U.S.C. § 363, the court must find that the sale

22  (a) is in the "best interests" of the estate and its creditors; (b) has a legitimate business

23  justification; (c) was negotiated in good faith and at arm's length; and (d) satisfies the

24  various tests and conditions for "adequate assurance" for nondebtor contract parties under

25  Section 365 and for a sale "free and clear" of liens and claims under Section 363(f).

26  Particularly after the Joint Plan was proposed, the sale to Blue Wolf pursuant to the APA

FENNEMORE CRAIG, P.C.

PHOENIX

1   was not in the best interests of the estate and its creditors, and did not satisfy the

2   requirements for a sale "free and clear" of liens.

3        Unhappy with the probable cap of $175,000 on its damages if it could successfully

4   recover on a breach of contract claim, Blue Wolf decided to shoehorn the facts into a tort

5   claim in order to try to recover a claim of $1.4 million. Blue Wolf cannot satisfy each of

6   the elements of a fraud claim, as it must do in order to be successful, and it cannot show

7   either justifiable reliance or proximate and consequential damages, as it must do in order

8   to recover under either of its tort theories.

9        As the Debtor has asserted above, the Debtor did not misstate its authority to

10  present the Blue Wolf sale to the Court for approval, and its ultimate decision not to ask

11  the Court to approve the sale was based on Blue Wolf's failure to enter into a modification

12  of MPT's lease, Bank SNB's objection to the sale and support of the joint plan proposed

13  with Gilbert Hospital, and the fact that the proposed purchase price did not offer a

14  sufficient return to unsecured creditors. Consequently, Blue Wolf is not entitled to

15  recover on its claims against the Debtor.

16        DATED this 26th day of September, 2017.

17                   FENNEMORE CRAIG, P.C.

18

19               By  */s/ Nancy J. March*
                      Gerald L. Shelley

20                      Nancy J. March
                      Attorneys for Debtor

21                      Florence Hospital at Anthem, LLC

22

23

24

25

26

NMARCH/13238549.1/039450.0001