# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>FLORENCE HOSPITAL AT ANTHEM, LLC,<br><br>     Debtor. | Chapter 11 Proceedings<br><br>Case No. 4:13-bk-03201-BMW<br><br>**RULING AND ORDER REGARDING BLUE WOLF CAPITAL FUND III, L.P.'S ADMINISTRATIVE EXPENSE CLAIM** |

  This matter came before the Court pursuant to Proof of Claim 76-1 filed by Blue Wolf Capital Fund III, L.P. ("Blue Wolf") on March 24, 2015, which was subsequently deemed an application for payment of an administrative expense claim;[1] the *Objection of Debtor to Claim No. 76 filed by Blue Wolf Capital Fund III, L.P.; and Notice of Bar Date for Claimant to Respond to Objection (14 Days After Service of This Notice)* (the "Objection") (DE 1068) filed by Florence Hospital at Anthem, LLC ("the Debtor" and/or "FHA") on September 4, 2015; the *Response of Blue Wolf Capital Fund, III, L.P. to Objection of Debtor to Claim No. 76 filed by Blue Wolf Capital Fund III, L.P.* (the "Response") (DE 1105) on September 22, 2015; and all pleadings related thereto. An evidentiary hearing was conducted on September 27-28, 2017, at which time the parties presented evidence and oral argument. Testimony was provided by Dr. Timothy Johns ("Dr. Johns"), Philip R. Rudd ("Mr. Rudd"), Arthur M. Doloresco ("Mr. Doloresco") and Charles P. Miller ("Mr. Miller"). At the conclusion of the trial, the Court

---

[1] *See Order Approving Stipulation to Treat Blue Wolf's Proof of Claim, Objections and Responses Thereto, as Application for Order Allowing and Directing Payment of Administrative Expense Claim* (DE 1233).

allowed the parties to submit post-trial briefing, which was completed on October 27, 2017, and the Court took the matter under advisement. Based on the pleadings, the testimony offered, the exhibits entered into evidence, and the entire record before the Court, the Court now issues its ruling.

## I.      Statement of Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(B). This decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052, and as made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014(c).

## II.      Issues

The only issue before the Court at this time is whether Blue Wolf is entitled to an administrative claim against the Debtor under the tort theories of fraudulent or negligent misrepresentation related to the Blue Wolf sale process. To the extent the Court determines that Blue Wolf is entitled to an administrative claim, the issue as to the amount of damages has been reserved for determination at a later date.

## III.      Factual and Procedural Background

### A.      <u>Bankruptcy Filings of FHA and Gilbert Hospital</u>

1.      Dr. Johns is the founder of FHA and a related hospital, Gilbert Hospital, LLC ("GH").

2.      On March 6, 2013, the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date"). Dr. Johns signed the petition as manager of the Debtor.

3.      From the Petition Date through the Effective Date of FHA's joint plan of reorganization in 2016, Dr. Johns was the sole manager and a member of FHA.

4. The Debtor remained in possession of its property and operated its business as a hospital in the ordinary course during the Chapter 11 case.

5. Dr. Johns was the interim Chief Executive Officer ("CEO") of FHA from April 26, 2013 until September 3, 2013. On September 16, 2013, the Debtor filed a notice stating that the Debtor had retained Arthur Doloresco as the new CEO. (DE 313). Court approval was not requested for Mr. Doloresco's retention. Mr. Doloresco did not have a signed employment contract with the Debtor. (9/28/17 Trial Tr., p. 9).[2]

6. Dr. Johns was involved in retaining Polsinelli PC ("Polsinelli") to replace the Debtor's original counsel, and in hiring CKS Advisors, LLC ("CKS") to serve as the Debtor's financial advisor and investment banker/sale agent. (9/27/17 Trial Tr., pp. 86, 116). Dr. Johns provided the retainers to Polsinelli ($75,000) and CKS ($24,000). (*See* DE 198, 202).

7. Dr. Johns received all Court filings in this case.

8. On February 5, 2014, GH filed its petition under Chapter 11 of the Bankruptcy Code. (Case No. 2:14-bk-01451-MCW). Bradley Newswander signed the GH petition as Board Chair. Dr. Johns was the majority member of GH, and sat on GH's management board.

9. The Debtor's Schedules indicate that GH was the Debtor's largest unsecured creditor.

10. The Debtor and GH asserted numerous cross-claims against each other during the course of the bankruptcy cases.

**B.** **The Sale Process**

11. On April 2, 2014, the Debtor filed an *Application to Employ CKS Securities, LLC as Investment Banker*, to serve as the Debtor's investment banker and sale agent for the purpose of pursuing a sale of FHA. (DE 505). An order approving this application was entered on April 15, 2014, and amended on May 23, 2014. (DE 514, 538).

---

[2] References to the trial transcript are by date and page. For example, a reference to page 8 from the September 27, 2017 transcript, would be identified by: "9/27/17 Trial Tr., p. 8." References to exhibits that were admitted into evidence at trial are indicated by "TE __."

### C.    The Terner Sale Proceedings

12.    On June 11, 2014, the Debtor filed the *Debtor's Motion for Orders: (1) Approving Sale of Debtor's Assets Free and Clear of Liens, Claims and Interests, (2) Approving Assumption and Assignment of Unexpired Leases and Executory Contracts, (3) Approving Certain Bid and Auction Procedures, (4) Setting Date and Time for Hearing on Proposed Sale, and (5) Approving Form and Notice of Auction and Sale Hearing* (the "Sale Motion"), in which it proposed to sell substantially all of its assets to Terner Capital Group, LLC ("Terner") for $7,500,000. (DE 543, TE 6). The Sale Motion sought approval of a Letter of Intent submitted by Terner (the "Terner LOI") and requested that Terner be designated as the stalking horse bidder.

13.    Five parties-in-interest filed objections to the Sale Motion, including Bank SNB National Association ("Bank SNB") (on the basis that the offer was not sufficient to pay its secured claim); FHA's landlord, MPT of Florence, LLC ("MPT") (on the basis that the sale could not affect its rights under its lease); GH; the Official Committee of Unsecured Creditors of FHA (the "FHA Committee") (as to the $350,000 cost reimbursement); and the United States Trustee for the District of Arizona (the "UST"). (DE 549-553, TE 225-229).

14.    At a status hearing on August 18, 2014, the Debtor reported that Terner was not proceeding with its offer, but that a prior potential stalking horse bidder, which was later identified as Blue Wolf, was still interested in purchasing the Debtor's assets. (DE 583).

### D.    The Blue Wolf Sale Proceedings

15.    On September 25, 2014, the Debtor filed a *Notice of Filing: (1) Letter of Intent from Blue Wolf Capital Fund III, L.P.; (2) Proposed Form Asset Purchase Agreement Regarding the Sale of the Debtor's Assets; and (3) Proposed Order Establishing Bid Procedures, Setting Date and Time of Sale Hearing, and Setting Related Deadlines* (the "Blue Wolf Notice"). (DE 594, TE 8).

16.    Pursuant to the Letter of Intent executed by Blue Wolf (together with any revisions or modifications, the "Blue Wolf LOI"), as attached to the Blue Wolf Notice, Blue

Wolf proposed to purchase substantially all of the Debtor's assets for cash consideration of $5,000,000 and the assumption of specified liabilities. The Debtor, through Mr. Doloresco, agreed to and accepted the terms of Blue Wolf's offer as an acceptable opening bid as the stalking horse bidder.

17.     Blue Wolf is a sophisticated investor with experience bidding on assets in bankruptcy court sales under 11 U.S.C. § 363. (9/28/17 Trial Tr., p. 148).

18.     The Blue Wolf LOI initially provided for a $300,000 "cost reimbursement" to Blue Wolf, payable in the event Blue Wolf was not the successful bidder, or if no auction or sale of the Debtor's assets occurred. The proposed order establishing bid procedures provided that Blue Wolf's cost reimbursement would be granted a super-priority administrative claim status, priming the security interests of Bank SNB and other creditors.

19.     On September 30, 2014, MPT filed a *Limited Objection and Statement of Position with Respect to Debtor's Proposed Sale Procedures Order and Related Matters*. (DE 600). MPT objected to any condition that would require the Debtor's Lease with MPT to be renegotiated and amended, and to the terms of the proposed cost reimbursement.

20.     On October 1, 2014, Bank SNB filed its *Objection to Entry of Order Approving Certain Proposed Bid and Auction Procedures*. (DE 601). The objections of Bank SNB to the proposed procedures included the failure of the Debtor to expressly recognize Bank SNB's right to credit bid. Bank SNB's objection also raised concerns about the "extremely low purchase price" proposed by Blue Wolf and that the sale constituted an improper *sub rosa* plan.

21.     On October 1, 2014, GH filed its *Objection and Joinder in MPT's and Bank SNB's Objections and Statements of Position Concerning Proposed Order Establishing Bid Procedures*. (DE 603). GH joined in the objections of other parties and alleged that it held an administrative expense claim against FHA in the amount of $1,300,751.74. GH further noted that the Blue Wolf LOI provided that Bank SNB would be paid no more than $3.7 million on its claim of more than $9.8 million.

/ / /

/ / /

22.     The Court conducted hearings on October 2, 2014 and October 6, 2014, regarding the proposed bid procedures and sale process. Dr. Johns appeared by telephone at the October 6, 2014 hearing.

23.     On October 8, 2014, Bank SNB and GH filed a *Notice of Commitment to File Creditor's Plan* (the "Commitment Notice"). (DE 607). The Commitment Notice provided that Bank SNB and GH "hereby commit to filing, by no later than Friday, October 17, 2014, a Chapter 11 Plan proposed by Bank SNB and/or Gilbert Hospital." (DE 607). Neither GH nor Bank SNB filed a plan by October 17, 2014, but instead filed an *Amended Notice of Commitment to File Creditor's Plan*. (DE 611).

24.     On October 10, 2014, FHA filed an *Amended Notice of Filing: (1) Amended Letter of Intent from Blue Wolf Capital Fund III, L.P.; (2) Proposed Form Asset Purchase Agreement Regarding the Sale of the Debtor's Assets; and (3) Proposed Order Establishing Bid Procedures, Setting Date and Time of Sale Hearing, and Setting Related Deadlines* (the "Amended Notice of Filing"), which included an amended version of the Blue Wolf LOI. (DE 608, TE 7). The amended Blue Wolf LOI provided for a cost reimbursement of $175,000, payable only if Blue Wolf entered into an asset purchase agreement and was not the successful buyer, due to an overbid. (DE 608, TE 7).

25.     On October 17, 2014, the Court entered its *Order Establishing Bid Procedures, Setting Date and Time of Sale Hearings, and Setting Related Deadlines* (the "Bid Procedures Order"). (DE 613, TE 9). In the Bid Procedures Order, the Court approved Blue Wolf as the stalking horse bidder under the terms of the revised Blue Wolf LOI and set various deadlines including: (1) the filing of an executed asset purchase agreement by December 5, 2014; (2) setting a bid deadline of December 10, 2014; (3) setting December 15, 2014 as the deadline to file objections to the proposed sale and auction; and (4) setting a sale hearing to be conducted on January 7, 2015. Bank SNB was given the right to credit bid.

26.     The Bid Procedures Order required the Debtor to provide Blue Wolf with "prompt access to the corporate, business, financial, accounting, tax, customer, supplier, and all other records and information relating to the Debtor as requested . . . ." (DE 613, TE 9).

27.     On November 17, 2014, after the Court had entered the Bid Procedures Order, but before Blue Wolf had completed its due diligence and notified the Debtor of its intent to proceed, GH filed a *Joint Plan of Reorganization for Gilbert Hospital, LLC and Florence Hospital at Anthem, LLC Proposed by Gilbert Hospital, LLC and Bank SNB Dated November 17, 2014* (the "Joint Plan"). (DE 629, TE 235).

28.     On December 3, 2014, after completing its due diligence, Blue Wolf informed the Debtor that it intended to proceed with the acquisition of FHA's assets. In connection with this notice, as required by the Bid Procedures Order, Blue Wolf and the Debtor executed and entered into an Asset Purchase Agreement (the "Blue Wolf APA") providing for the sale of substantially all of the assets of the Debtor to Blue Wolf, and the Debtor filed the Blue Wolf APA with the Court. (*See* DE 645, TE 11). Mr. Doloresco executed the Blue Wolf APA on behalf of the Debtor.

29.     In the Blue Wolf APA, the Debtor represented and warranted, *inter alia*, that:

> (1)     Subject to final approval by the Bankruptcy Court pursuant to the Sale Order, Seller has the full right, power and authority to enter into this Agreement and the Related Agreements, as applicable, and to consummate the Transactions. Blue Wolf APA, § 5.1.

> (2)     Seller has duly executed and delivered this Agreement, and this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms . . . . *Id.* at § 5.2.

> (3)     Subject to final approval by the Bankruptcy Court pursuant to the Sale Order, the execution, delivery and performance of this Agreement and the Related Agreements by Seller . . . do not and will not violate, conflict with or result in the breach of any provision of Seller's articles of organization or limited liability company agreement. *Id.* at § 5.3.

30.     On December 15, 2014, after the Blue Wolf APA was filed with the Court, Bank SNB provided notice that it intended to credit bid $5,275,000 for the Debtor's assets. (*See* DE 668). Bank SNB subsequently withdrew its intent to credit bid on January 27, 2015. (DE 752).

31. Pursuant to the Blue Wolf APA, the Court's entry of a sale order was a condition precedent to the closing of the sale, as was, among other things, an amendment or modification to the Debtor's Real Property Lease with MPT (the "MPT Lease"), the negotiation of an employment agreement with Mr. Doloresco, and the completion of an IT Hosting Services Agreement (collectively, the "Conditions Precedent"). (DE 645, TE 11).

### i. **Corporate Authority**

32. On December 4, 2014, the Court conducted a hearing on procedural issues regarding the Joint Plan (the "December 4 Hearing"), at which time counsel for Dr. Johns reported that Dr. Johns was reserving his right to object to the Blue Wolf sale. Counsel for, and a representative of, Blue Wolf appeared telephonically at the December 4 Hearing. (DE 652).

33. On December 10, 2014, the Court held a hearing on the Joint Plan (the "December 10 Hearing"), at which time Bank SNB raised concerns about the Debtor's corporate authority to enter into the Blue Wolf sale. Counsel for, and a representative of, Blue Wolf appeared telephonically at the December 10 Hearing. (DE 667).

34. On December 12, 2014, Dr. John's filed his *Statement of Position Regarding Sale of Assets* (the "Position Statement") attaching the Declaration of Dr. Johns (the "Declaration"). (DE 665). In this Declaration, Dr. Johns states as follows:

1. I am over 18 years of age, and competent to testify.
2. I have personal knowledge of the facts stated herein.
3. I am the founder and sole manager of the Debtor.
4. I have never assigned or delegated my managerial rights and authority implicated by the Sale Motion and Asset Purchase Agreement to any employee, officer or counsel of the Debtor.
5. A trustee has not been appointed for the management of the Debtor.
6. To my knowledge, no court order or other determinative ruling has been issued or rendered removing Dr. Johns as the manager of the Debtor.
7. Under the Debtor's Operating Agreement, only the manager and, in certain circumstances, the members have the authority to sell substantially all of the Debtor's assets.

8. In my capacity as Manager of the Debtor, I have never been asked to, nor have I authorized or approved the Sale Motion, the Asset Purchase Agreement, or any sale of substantially all of the Debtor's Assets.

9. To my knowledge, the members of the Debtors have never been asked to provide consent or authority for any sale, and have not provided any consent or authority for any sale.

10. I have not delegated or assigned to any employee, officer or counsel the right to authorize or approve, on behalf of the Debtor, a sale of the Debtor's assets.

11. To my knowledge, there is no resolution or authorization that has been provided by me as the Manager, or the members of the Debtor to sell substantially all of the Debtor's assets.

12. About the time of the Sale Motion, the Debtor's CEO unilaterally terminated all of my computer access to the Debtor's accounts, books and records. I was not involved in, or even informed of the substance or content of most negotiations for the Asset Purchase Agreement, and the only information I received about the Asset Purchase Agreement was through filed documents.

13. No process or procedure was initiated to remove me from any position. The Debtor's senior officers and its counsel simply unilaterally asserted that I had a conflict because of my position on the Gilbert Board of Directors, and that I would no longer be involved in negotiations or given confidential information.

14. I objected to being shut out and I did not consent to being removed from the process, nor did I abdicate any authority. I repeatedly requested to be provided the information to which I was entitled to as manager. Debtor's senior officers and counsel refused to provide such information except on conditions that were unacceptable to me.

15. I have personally guaranteed a substantial amount of the Debtor's debt to Stillwater National Bank. I am currently being personally sued on that guarantee.

16. I am also the largest single equity holder for the Debtor.

17. I have an interest in maximizing the value of the Debtor, and seeing that it can repay as much as possible to Stillwater National Bank.

18. Because I have been excluded completely from the Sale Motion process, I am unaware of any facts that have not

been publicly disclosed, but I fear that a primary motivation of the Sale Motion is (1) to protect the employment or employment opportunities for current senior officers of the Debtors, who are not equity holders, but just employees, and (2) to maximize potential return for administrative claimants including counsel.

19. I object to a sale of the Debtor's assets to the extent that such a sale is intended to have or has the result of primarily or substantially benefitting existing senior officers so that they can retain their employment, and administrative claimants both to the detriment of creditors and equity holders of the Debtor.

35. At no time after the Blue Wolf LOI was filed with the Court on September 25, 2014 until December 12, 2014, did Dr. Johns communicate to Blue Wolf, Mr. Doloresco, Mr. Rudd or the Court that he did not consent to proceeding with the auction sale with Blue Wolf as stalking horse bidder, pursuant to the Bid Procedures Order.

### ii. <u>The Sale Objections</u>

36. On December 15, 2014, pursuant to the Sale Procedures Order, four parties filed objections to the Blue Wolf sale: Bank SNB, MPT, the UST, and GH (collectively the "Sale Objections"). (DE 673-676, TE 33, 34, 37). The following grounds for objection were raised: (a) the Debtor's lack of proper corporate authority to pursue the sale; (b) the inability of the sale to be approved under 11 U.S.C. § 363 in light of the *Clear Channel* case;[3] (c) the impermissibility of the sale as a *sub rosa* plan; (d) the sale's lack of benefit to the estate; (e) the lack of adequate assurance under 11 U.S.C. § 365; and (f) the failure of the sale to satisfy the business judgment rule.

37. On December 31, 2014, Blue Wolf filed a *Response of Blue Wolf Capital Fund, III, L.P. to Objections to Sale Motion*, which addressed the *sub rosa* plan and 11 U.S.C. § 363 arguments, but did not address issues with respect to the Debtor's corporate authority. (DE 697, TE 94).

---

[3] *Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW, LLC*), 391 B.R. 25 (B.A.P. 9th Cir. 2008).

38. On December 31, 2014, the Debtor filed an *Omnibus Reply in Support of Debtor's Motion for Orders: (1) Approving Sale of Debtor's Assets Free and Clear of Liens, Claims and Interests, and (2) Approving Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "Omnibus Reply"), in which it asserted that Mr. Doloresco had, and continued to have, proper authority to enter into and consummate an agreement to sell the Debtor's assets subject to Court approval. (DE 703, TE 25). In addition, the Debtor stated that Dr. Johns "did not oppose the Sale Motion and he did not instruct the Debtor's counsel to withdraw the Sale Motion."

39. On January 5, 2015, MPT filed a *Motion for Order Scheduling, and Establishing Related Pre-Trial Procedures for, An Evidentiary Hearing Regarding Proposed Assignment of Real Property Lease* (the "Procedures Motion"). (DE 710). Bank SNB and GH joined in the Procedures Motion. (*See* DE 714 and 716). The Procedures Motion was set for an expedited hearing on January 7, 2015.

40. On January 6, 2015, the Debtor filed a motion to convert the January 7, 2015 hearing to a status hearing. (*See* DE 715). At the hearing held on January 7, 2015, the Debtor provided the status of the sale negotiations and GH, Bank SNB, and MPT discussed issues regarding the Procedures Motion. The Court continued all matters to a January 9, 2015 status hearing. (*See* DE 721). At the January 9, 2015 hearing, the parties confirmed that there was no agreement between MPT and Blue Wolf, that the authority issue was still outstanding, that the § 363(f) issues were still outstanding, and that an employment agreement with Mr. Doloresco had not been finalized. The Court again granted the Debtor's request to continue all matters to a January 27, 2015 status hearing, and vacated the evidentiary hearings set for January 13, and 14, 2015. (*See* DE 735).

41. Prior to the January 27, 2015 hearing, as directed by the Court, the UST filed a statement regarding accrued administrative expense liability in the case, and Bank SNB withdrew its credit bid. (DE 749 and DE 752). At the January 27, 2015 hearing, Debtor's counsel reported that there was still no deal with MPT, so the sale could not move forward. The parties also reported that other objections to the sale, including those under § 363 and those

with regard to corporate authority, were still outstanding. At the conclusion of the hearing the Court stated that if no consensual agreement regarding corporate authority was reached, the Court would have to decide immediately if it should appoint a trustee or examiner to determine the status of the case, the sale and/or the Joint Plan. The Court granted the Debtor's request to again continue the hearing on the Blue Wolf sale to a February 11, 2015 status hearing. (DE 753).

42. On February 9, 2015, the Debtor filed the *Debtor's Request to Take Sale Proceedings Off of the Court's Calendar and to Vacate Hearing on February 11, 2015, Subject to Resetting*, which was granted by Court order on February 10, 2015 (DE 760 and DE 762). On February 13, 2015, the Debtor filed its *Notice that Blue Wolf Capital Fund III, L.P. and MPT of Florence, LLC Have Entered into a Term Sheet Concerning the Assignment of the MPT Lease by Debtor to Blue Wolf*. (DE 764). The sale proceedings were not subsequently put back on calendar.

### iii. The Default Notice under the Blue Wolf APA

43. On March 19, 2015, Blue Wolf notified the Debtor of an Event of Default (the "Default Notice") under the Blue Wolf APA due to the Debtor's failure to prosecute the Sale Motion and to seek approval of and closing of the Blue Wolf sale in accordance with the terms of the Blue Wolf APA and the Bid Procedures Order. The Default Notice further provided that the Debtor could cure the default by:

> (a) Obtaining a hearing before the Bankruptcy Court on the Seller's corporate authority to proceed by April 15, 2015; subject to the Bankruptcy Court's docket; and
> (b) Obtaining a ruling from the Bankruptcy Court that the Debtor has the corporate authority to proceed to consummate and close the [Blue Wolf] sale transaction under the APA within 30 days of the Hearing, again, subject to the Bankruptcy Court's schedule and docket.

(TE 22).

44.     The Default Notice provided that if the Debtor failed or was unable to cure the events of default, Blue Wolf intended to pursue an administrative expense claim for asserted damages related to the sale process.

### iv.     <u>The Blue Wolf Claim and the Objection</u>

45.     On March 24, 2015, Blue Wolf filed a proof of claim (Claim 76-1), seeking an administrative claim in the amount of $693,157 representing its asserted damages caused by the Debtor's failure to proceed with the Blue Wolf sale (the "Claim").

46.     On February 16, 2017, Blue Wolf filed its *Supplement to Administrative Expense Claim Filed by Blue Wolf Capital Fund III, L.P.* (the "Supplement to Claim"). (DE 1515). On September 18, 2017, Blue Wolf filed its *Amended Supplement to Administrative Expense Claim Filed by Blue Wolf Capital Fund III, L.P.* (the "Amended Supplement to Claim"). (DE 1570). The Supplement to Claim and Amended Supplement to Claim assert that Blue Wolf's administrative claim is based upon "torts committed by the Debtor consisting, *inter alia*, of fraud and/or negligent misrepresentation of the Debtor's authority:  (a) to conduct a court-approved marketing and sale process for the sale of substantially all of the Debtor's assets to Blue Wolf, and (b) to enter into various agreements with Blue Wolf for the sale of its assets." Blue Wolf alleges that such agreements included the Blue Wolf LOI, the Bid Procedures Order and the Blue Wolf APA. Blue Wolf further asserts that the alleged misrepresentations were made through Debtor's counsel, Mr. Doloresco, as its CEO, and Dr. Johns. In addition to its claim for tort damages, Blue Wolf is seeking recovery of attorneys' fees and costs incurred in the prosecution of its claims. The Claim, Supplement to Claim and Amended Supplement to Claim are collectively referred to hereafter as the "Administrative Claim." As of August 2017, the Administrative Claim and the fees and costs incurred in connection therewith totaled $1,514,880.94.

47.     On September 4, 2015, the Debtor filed its Objection. On September 22, 2015, Blue Wolf filed its Response.

48.     On November 18, 2015, the Court entered its *Order Approving Stipulation to Treat Blue Wolf's Proof of Claim, Objections and Responses Thereto, as Application for Order Allowing and Directing Payment of Administrative Expense Claim* deeming the Administrative Claim to be an application for administrative expense claim and converting the litigation regarding the Administrative Claim into a contested matter. (DE 1233).

### v.     The Joint Plan

49.     The Joint Plan was amended and modified on several occasions. As amended, the Joint Plan provided for full payment to unsecured creditors. (DE 792, 843, 1183 at ¶ 3). Ultimately, and after hearings conducted on September 24, 2015, October 8, 2015 and October 21, 2015, all objections to the Joint Plan were resolved and all impaired classes entitled to vote, including the class of unsecured creditors, voted to accept the Joint Plan as amended and modified.

50.     The Joint Plan, as amended and modified, was confirmed by Order of this Court on October 23, 2015. A *Stipulated Order Amending Findings of Fact, Conclusions of Law and Order Confirming Second Amended Joint Plan of Reorganization and Declaring Effective Date* was entered on February 29, 2016. (DE 1381). The Effective Date of the Amended Joint Plan was February 19, 2016. (DE 1381).

### IV.    Legal Analysis and Conclusions of Law

### A.    Basis for Administrative Expense Claims

In most cases, two requirements must be met under Ninth Circuit case law in order to establish an actual and necessary administrative expense under § 503(b)(1)(A) of the Code: (1) "the claim must have arisen from a transaction with the debtor in possession[,]" and (2) the claim "must directly and substantially benefit the estate." *In re 800Ideas.com, Inc.,* 496 B.R. 165, 175 (B.A.P. 9th Cir. 2013). However, in *Reading Co. v. Brown*, the U.S. Supreme Court carved out an exception to the traditional actual and necessary requirements. 391 U.S. 471 (1968); *see also In re Ybarra*, 424 F.3d 1018, 1025 n.10 (9th Cir. 2005) (construing *Reading*

as "determin[ing] that an award of tort damages to victims of a fire caused by the Chapter 11 receiver's negligence was entitled to administrative expense priority, despite the fact that victims did not transact with the receiver, nor did the estate benefit from the event"). Although *Reading* was decided under the Bankruptcy Act, it survived the enactment of the Bankruptcy Code and is recognized by the Ninth Circuit. *E.g. In re Kadjevich*, 220 F.3d 1016, 1019 (9th Cir. 2000); *In re Megafoods Stores, Inc.*, 163 F.3d 1063, 1071 (9th Cir. 1998). Under the *Reading* exception, as expanded by the Ninth Circuit, a debtor-in-possession's violation of 28 U.S.C. § 959(b) can, under certain circumstances, give rise to an administrative claim for damages. *See In re Megafoods Stores, Inc.*, 163 F.3d at 1072; *In re 800Ideas.com, Inc*, 496 B.R. at 177–78.

Generally, 28 U.S.C. § 959(b) requires a debtor-in-possession to "manage and operate the property in [its] possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b). Blue Wolf contends that it is entitled to an administrative expense claim because the Debtor committed the torts of fraudulent misrepresentation and/or negligent misrepresentation while acting as a debtor-in-possession, in the course of the sale process, in violation of 28 U.S.C. § 959(b). The Debtor's property and assets are located in Arizona. Accordingly, Arizona law applies for purposes of 28 U.S.C. § 959(b).

The representations at issue pertain to the Debtor's corporate authority to pursue a sale of its assets and to enter into certain agreements with Blue Wolf, including the Blue Wolf LOI, the Bid Procedures Order and the Blue Wolf APA. Blue Wolf has expressly waived its right to pursue contract theories of liability. (9/28/17 Trial Tr., p. 161).

## B. Negligent Misrepresentation

Under Arizona law, which incorporates the Second Restatement of Torts, the elements of negligent misrepresentation are: (1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect

information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the incorrect information; and (5) resulting damage. *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (Ariz. 1987); *Mur-Ray Mgmt. Corp. v. Founders Title Co.*, 819 P.2d 1003, 1008-09 (Ariz. Ct. App. 1991). *See also* Restatement (Second) of Torts § 552 (Am. Law Inst. 1979).

"A claim for relief for negligent misrepresentation is one governed by the principles of the law of negligence. Thus, there must be 'a duty owed and a breach of that duty before one may be charged with the negligent violation of that duty.'" *Van Buren v. Pima Cmty. Coll. Dist. Bd.*, 113 Ariz. 85, 87, 546 P.2d 821, 823 (Ariz. 1976) (quoting *West v. Soto,* 85 Ariz. 255, 336 P.2d 153 (Ariz. 1959)). The alleged breach must also be the proximate cause of the damages for which recovery is sought. *Laborers' & Operating Engineers' Util. Agreement Health & Welfare Tr. Fund for Arizona v. Philip Morris, Inc.*, 42 F. Supp. 2d 943, 950 (D. Ariz. 1999).

In order to establish a claim for negligence, a party must generally prove the elements of the claim by a preponderance of the evidence. *See Harvest v. Craig*, 195 Ariz. 521, 523, 990 P.2d 1080, 1082 (Ariz. Ct. App. 1999); *see also Bros. v. Morrone-O'Keefe Dev. Co.*, 2006-Ohio-1160 at ¶ 20, 2006 WL 620894 at *5 (Ct. App. Ohio 2006) (noting "that other jurisdictions that have adopted Section 552 of the Restatement also apply the preponderance of the evidence standard to negligent misrepresentation claims").

## 1. False Representations and Material Omissions

Blue Wolf asserts that the Debtor made false representations regarding the Debtor's authority to conduct the sale process and to enter into certain agreements regarding the sale of assets, on the basis that neither the sale process nor the documents were approved by Dr. Johns. For purposes of the Administrative Claim Blue Wolf <u>assumes</u> that Dr. Johns had sole authority to approve the sale terms and the documents. (9/28/17 Trial Tr., p. 156). Mr. Miller, as the representative of Blue Wolf, acknowledged during his testimony that he has never asked about

corporate authority in bankruptcy proceedings involving § 363 sales. (9/28/17 Trial Tr., p. 148).
Presumably no one from Blue Wolf inquired as to corporate authority during the due diligence
period, either. The Court finds this difficult to understand given Blue Wolf's sophistication as
an investor and the fact that Mr. Miller indicated that Blue Wolf would not proceed with a sale
without a "clear grant[ing] of authority by the governance entity . . . ." (9/28/17 Trial Tr., p.
156).

That being said, the issue of corporate governance was never determined by the
Court as part of the sale process. For purposes of the Administrative Claim, Blue Wolf relies
upon: (1) a form of First Amended Operating Agreement for FHA (TE 1); (2) Articles of
Organization for FHA filed with the Arizona Corporation Commission in 2007 showing Dr.
Johns as the sole manager (TE 81); and (3) the Position Statement and Declaration of Dr. Johns.

The Court notes that the Operating Agreement is not fully executed. Further, no
testimony was provided as to whether it is in fact the operative agreement. Finally, if such
agreement is operative, Dr. Johns would not have sole authority to approve a sale process.
Given the limited and incomplete evidence presented, it is not clear to the Court whether, or
not, Dr. Johns had sole authority to approve the sale process, or in fact who had such authority.
The evidence is not determinative on this issue.

Even however, assuming that he did, certain of Dr. Johns' statements in his
Statement of Position and Declaration are not entirely consistent with the testimony provided
and the procedural and factual background of the case. Although Dr. Johns states in his
Declaration that he had not authorized nor approved a sale to Terner or to Blue Wolf, he clearly
knew that a sale process was proceeding, given his involvement in the retention of CKS and
his discussions and meetings with Dave Gonzalez ("Mr. Gonzalez"), the principal of CKS,
including discussions of a "stalking horse bidder." It is also not contested that Dr. Johns was
served with all pleadings in the case, and that he attended hearings regarding the sale process,
including the hearing to approve the Bid Procedures Order on October 6, 2014. Dr. Johns also
testified as to a meeting with Blue Wolf and of being aware that it was a proposed buyer in the
sale process. As Dr. Johns stated in his testimony, it was his "understanding that I could accept

any bid at any time if it was in the best interest of the creditors." (9/27/17 Trial Tr., p. 26). Given such opinion, his failure to raise the issue until December 12, 2014 cannot be viewed as a material omission.

Further, although Dr. Johns states in his Declaration that he had not delegated nor assigned his authority to approve a sale of the Debtor's assets, his testimony and evidence presented indicates that while he may have delegated authority to proceed with a sale, he had not delegated authority to "close a sale." (TE 79; 9/27/17 Trial Tr., p. 79). This is consistent with letters subsequently sent by counsel for Dr. Johns, dated March 25, 2017, in which Dr. Johns revokes any delegation of authority to Mr. Rudd or Mr. Doloresco to "consummate a sale of assets of FHA . . . ." (TE 12).

As stated in the Declaration, Dr. Johns objected to the Blue Wolf sale to the extent that such sale was intended to have the "result of primarily or substantially benefitting existing senior officers so that they can retain their employment, and administrative claimants both to the detriment of creditors and equity holders of the Debtor." (TE 10). This objection does not state that he would oppose any sale. Dr. Johns clarified that he objected to this particular sale because it was not in the best interest of creditors in that creditors would not be paid in full and he understood it was structured to benefit certain individuals, including Mr. Doloresco and Mr. Gonzalez. (9/27/17 Trial Tr., p. 97). Dr. Johns further testified that the Joint Plan was ultimately "far superior to any Blue Wolf deal." (9/27/17 Trial Tr., p. 108). Dr. Johns' testimony was not controverted.

Blue Wolf also points to the Blue Wolf LOI, the Bid Procedures Order and the Blue Wolf APA as containing false misrepresentations due to Dr. Johns' failure to approve the terms of the transaction.

The Blue Wolf LOI was initially filed on September 25, 2014, and filed, as amended on October 10, 2014. The Blue Wolf LOI is a letter from Blue Wolf to the Debtor outlining a proposal whereby Blue Wolf would be designated the stalking horse bidder for purposes of a § 363 sale of substantially all of the Debtor's assets. Although Mr. Doloresco accepted the Blue Wolf LOI on behalf of the Debtor, there are no representations of the Debtor

in the letter and the LOI clearly provides that it is not binding on Blue Wolf. Further, Blue Wolf has not asserted any claim for the period prior to entry of the Bid Procedures Order and did not commence due diligence until after entry of that order on October 17, 2014. (9/28/17 Trial Tr., p. 143). There could therefore not be any false representations relating to the Blue Wolf LOI.

It is unclear what representations are made in the Bid Procedures Order. It is an Order of the Court, which set deadlines and procedures for proceeding with the sale, but did not contain any representations by the Debtor. Further, it is a final order of the Court, which clearly authorized the sale process to go forward. With respect to the Blue Wolf APA, Blue Wolf asserts that the provisions in Section 5 contain misrepresentations. As an initial matter, the provisions in Section 5 are all clearly conditioned upon the final approval of a sale by the Court. Until Court approval was obtained, which it never was, the terms of the Blue Wolf APA were not effective or binding upon any party.

Based upon the foregoing, it is the determination of the Court that Blue Wolf has failed to prove, by a preponderance of the evidence, that negligent misrepresentations were made with respect to pursuing a sale or with respect to the sale documents.

### 2. Intent

The second prong of negligent misrepresentation requires intent that false information be relied upon. Blue Wolf asserts that Dr. Johns, Mr. Rudd and Mr. Doloresco intended that Blue Wolf rely upon false information, specifically as to Dr. Johns' corporate authority. Even assuming that Dr. Johns had sole authority to approve the sale with Blue Wolf, the evidence reflects that both Mr. Rudd and Mr. Doloresco believed that authority to proceed with the sale process had been delegated to them, at least up to the point of closing.

Mr. Rudd's testimony states that due to Dr. Johns' conflicts, specifically that in addition to being the manager of FHA, he was a creditor of FHA, a guarantor of the Bank SNB debt, a director and member of GH, and a doctor at GH, Dr. Johns stepped back from the sale process and was not always included in the negotiations with buyers. (9/27/17 Trial Tr., pp. 117, 121).

Mr. Rudd testified that Dr. Johns approved the process to sell the assets of FHA and gave authority to Mr. Rudd, Mr. Gonzalez and Mr. Doloresco to proceed with that process. (9/27/18 Trial Tr., pp. 157, 159, 160). Mr. Rudd stated, "I believe that I had the authority from Dr. Johns to sell the assets and to maximize the recovery to the bankruptcy estate, and I had the authority from Art Doloresco, as the CEO, who has . . . authority from Dr. Johns, . . . to file pleadings with respect to the sale." (9/27/18 Trial Tr., p. 157).

Mr. Doloresco's testimony is consistent with Mr. Rudd's statement that they had authority to proceed with the sale process up to the last steps before closing. (9/28/17 Trial Tr., p. 39). This view is consistent with Dr. Johns' position regarding delegation of authority discussed above, specifically that he had not delegated authority to "close a sale."

Based upon the foregoing, both Mr. Rudd and Mr. Doloresco believed that they were authorized to proceed with the Blue Wolf sale process, at least to the point of obtaining court approval. No controverting evidence was presented that they intended to provide misleading or false information to Blue Wolf.

Based on the foregoing, it is the Court's determination that the intent prong of negligent misrepresentation has not been met, by a preponderance of the evidence.

### 3.    Causation

"Proximate causation is . . . a necessary element of any tort . . . ." *Laborers' & Operating Engineers' Util. Agreement Health & Welfare Tr. Fund for Arizona*, 42 F. Supp. 2d at 950. In order to establish fault in a negligence action, "a plaintiff must prove that the defendant's negligence proximately caused the plaintiff's injury." *Saucedo ex rel. Sinaloa v. Salvation Army*, 200 Ariz. 179, 183, 24 P.3d 1274, 1278 (Ariz. Ct. App. 2001) (quoting *Stephens v. Bashas' Inc.*, 186 Ariz. 427, 431, 924 P.2d 117, 121 (Ariz. Ct. App. 1996)).

In this case, as will be discussed below, even assuming that misrepresentations or material omissions were made by the Debtor's representatives or professionals, such were not a direct cause of Blue Wolf's asserted damages.

As an initial matter, the Blue Wolf APA contained several conditions precedent to

a closing by Blue Wolf. These included: 1) a final order of this Court approving the sale, to be entered by January 15, 2015 or such later date as Blue Wolf may approve; 2) an amendment or modification to the MPT Lease, and 3) an employment agreement negotiated with Mr. Doloresco. (TE 11).

As set forth above, numerous objections were filed to the Blue Wolf sale. By mid-January 2015, the date by which a sale order was required to be entered, none of the objections had been resolved. Two of those objections, specifically the objections of MPT and Bank SNB, created major, if not insurmountable, hurdles to approval of a sale by the Court. Specifically, the MPT Lease had already been assumed, and could not be modified without MPT's consent. Further, Bank SNB was not getting paid in full, and did not consent to the sale, thus the sale may be denied under the reasoning of the *Clear Channel* case.

Further, by this time, the Joint Plan had been filed and was moving through the plan process toward plan confirmation. The Blue Wolf sale was competing with the Joint Plan. Blue Wolf continued to pursue the sale, even after the authority issue was raised, but did not increase its bid nor resolve any of the other Sale Objections, including those that were conditions precedent under the Blue Wolf APA.

In March 2015, Blue Wolf issued its Default Notice, which provided certain cure provisions, including that the Debtor obtain a hearing and ruling from the Court that the Debtor had the corporate authority to proceed with, consummate and close the Blue Wolf sale. Given that none of the Sale Objections had been resolved, this was an impossible request. This demand was only feasible if all other objections and conditions precedent had been satisfied and the only remaining issue was the corporate authority issue. If that had been the case, the Court could have resolved the corporate authority issue by appointing a trustee or by taking other appropriate action.

This however, ignores the fact that the Joint Plan had been filed and was competing with the sale. As Mr. Rudd testified, he viewed the Default Notice as a move by Blue Wolf to get the sale process back on track because the Joint Plan "was outbidding them" and the Blue Wolf proposal was no longer in the "best interests of the estate." (9/27/17 Trial Tr., p. 165).

Mr. Rudd further testified that the Debtor was trying to get Blue Wolf to increase its bid, but when that did not occur it did not make sense for the Debtor to pursue the Blue Wolf sale. (9/27/18 Trial Tr., p. 165-66).

Mr. Miller acknowledged that Blue Wolf assumed certain risks as part of a § 363 sale process, specifically the following: 1) the risk that it would be outbid; 2) the risk that the procedure would be cancelled by the fiduciaries in exercising their fiduciary obligation based on an occurrence precluding the sale from proceeding; and 3) the risk that the Court would not approve the sale. (9/28/17 Trial Tr., p. 153). In this case, the fiduciaries of the Debtor, including its professionals, determined that the Blue Wolf sale should not proceed in view of the Joint Plan, which provided a higher return to creditors. Given those circumstances, and even assuming all other objections were resolved, the Court would not have been in a position to approve the Blue Wolf sale, as it was not in the best interest of creditors. The bottom line is that Blue Wolf's asserted damages were caused by the occurrence of risks which it had assumed.

Upon consideration of the foregoing, it is the Court's determination that even assuming all other elements of negligent misrepresentation were met, the final prong of causation is not met in that any damages asserted by Blue Wolf were not the proximate result of such misrepresentation.

## C. Fraudulent Misrepresentation

Under Arizona law:

> A showing of fraud requires (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; (9) his consequent and proximate injury.

*Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 500, 647 P.2d 629, 631 (Ariz. 1982) (citing *Nielson v. Flashberg*, 101 Ariz. 335, 419 P.2d 514 (Ariz. 1966)). "Where [a party] has a legal

or equitable obligation to reveal material information, [its] failure to do so is equivalent to a misrepresentation and may therefore support a claim of actionable fraud where the remaining elements of that tort are proved." *Haisch v. Allstate Ins. Co.*, 197 Ariz. 606, 610, 5 P.3d 940, 944 (Ariz. Ct. App. 2000). In order to establish a claim for fraud, the moving party must prove all nine elements of fraud by clear and convincing evidence. *Comerica Bank v. Mahmoodi*, 224 Ariz. 289, 291, 229 P.3d 1031, 1033 (Ariz. Ct. App. 2010).

As set forth above, the elements of the torts of negligent misrepresentation and fraudulent misrepresentation are substantially similar. Fraudulent misrepresentation, however, requires that all nine elements of fraud must be proven by clear and convincing evidence, a stricter standard than the preponderance of the evidence standard. For the reasons stated in Section IV.B. above, the Court finds and concludes that Blue Wolf has failed to establish at least four elements of fraud, including:  1) the falsity of the representation; 2) the speaker's knowledge of its falsity; 3) intent and 4) consequent and proximate injury.

## V.    Conclusion

Based upon the foregoing factual and legal analysis, and in consideration of the totality of the evidence presented, the Court finds and concludes that Blue Wolf has failed to establish the elements necessary for a determination of liability under the tort theories of negligent or fraudulent misrepresentation. Accordingly, Blue Wolf is not entitled to an administrative expense claim against the Debtor.

Wherefore, for good cause shown:

IT IS HEREBY ORDERED that the Debtor's Objection is sustained and Blue Wolf's application for allowance of its Administrative Claim (filed as Proof of Claim 76-1, as supplemented) is denied.

DATED AND SIGNED ABOVE.